Maxine **GRADY**, Plaintiff–Appellant,

v.

**AFFILIATED CENTRAL, INC.,**
Defendant–Appellee.

No. 157, Docket 97–7100.

United States Court of Appeals,
Second Circuit.

Argued Oct. 10, 1997.

Decided Dec. 10, 1997.

Maxine Grady, Brooklyn, NY, pro se.

Andrew S. Hoffmann, New York City (Wiseman, Hoffmann & Walzer, New York City, on the brief), for Defendant–Appellee.

Before: KEARSE and CABRANES, Circuit Judges, and COTE, District Judge *.

KEARSE, Circuit Judge:

Plaintiff *pro se* Maxine Grady appeals from a judgment of the United States District Court for the Eastern District of New York, John Gleeson, *Judge,* dismissing her complaint alleging that defendant Affiliated Central, Inc. ("Affiliated"), terminated her employment on the basis of her age, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623 (1994). The district court granted summary judgment dismissing the complaint on the ground that Affiliated had presented a sufficiently supported nondiscriminatory reason for terminating Grady's employment and Grady had not produced evidence that could show that the reason advanced was false. On appeal, Grady contends that summary judgment was inappropriate because there was a genuine issue of fact to be tried as to the reason for her discharge. She also contends that summary judgment should not have been granted without affording her additional discovery. For the reasons below, we affirm.

## I. BACKGROUND

Most of the facts are not in dispute. We describe the events, most of which occurred in late September 1993, in the light most favorable to Grady as the party against whom summary judgment was granted.

### A. *Grady's Employment at Affiliated*

Affiliated is a central alarm station that provides 24–hour–a–day monitoring services for residential and business alarm vendors

---

* Honorable Denise Cote, of the United States District Court for the Southern District of New York, sitting by designation.

throughout the United States. The alarm signals received by Affiliated indicate burglaries, fires, hold-ups, and medical or other emergencies. Affiliated employs "central station operators" who monitor the alarm signals, using sophisticated computer terminals, and dispatch appropriate responses. The operators also answer telephone calls, perform customer service tasks, and make data entry changes in subscriber files. Stella Bacolas was Affiliated's central station manager; her responsibilities included hiring, training, and evaluating the central station operators.

In September 1993, Bacolas, who was then age 52, hired Grady, then age 51, as a trainee for the position of central station operator. Grady began her employment at Affiliated on September 20, 1993. Eight days later, Bacolas told Grady she was "not pleased." The next day, September 29, 1993, Richard Bunkiewicz, the central station operations manager, informed Grady that her employment with Affiliated was terminated.

## B. *The Present Action*

After filing a charge with the Equal Employment Opportunity Commission ("EEOC") and receiving a right-to-sue letter, Grady commenced the present action. The complaint alleged, *inter alia,* that one woman about 20–25 years of age (later identified as Danielle Pionegro) began as a trainee on the same day as Grady, and that at the end of Grady's first week, Affiliated hired two additional trainees (later identified as Denise Franco and Milagros Montano) who were about half Grady's age. The complaint alleged that there was "technically" no basis on which Affiliated could have evaluated Grady's performance as a trainee because she had no assignment other than observing the experienced operators; that Grady had nonetheless fielded several calls herself under the supervision of those operators; and that her performance as a trainee had been "magnificent[ ]," indeed, "light-years ahead of [her] fellow trainees." According to the complaint, Grady was fired without being given any reason; she was assured that "everything about [her] work" was "just fine" and was told that she was being fired because of a "gut feeling." The complaint alleged that Affiliated had discharged Grady to make room for the two newly hired, younger trainees and hence had discriminated against Grady on the basis of her age.

Following discovery, Affiliated moved for summary judgment, asserting that Grady had been discharged because of her poor work performance. Its motion was supported by, *inter alia,* an affidavit from Bacolas, who described Affiliated's training program in general and her experience with Grady in particular as follows:

7. Applicants who are hired are put through a brief training program before they are assigned to work on their own as operators. For the first few days of employment, the new trainees are instructed to observe experienced operators performing all aspects of the job. This includes computer terminal operations, data entry commands, alarm handling procedures and telephone etiquette. During these first few days, I spend several hours with each trainee making sure they are comprehending the various functions of the job. After a few days of observing, the trainees trade place [*sic*] with experienced operators and begin handling simple functions such as handling incoming calls and performing basic computer functions. If the trainee is able to grasp the required functions and duties, they are given more responsibility and, after a week or so, they are assigned to their own terminal.

8. Maxine Grady ("Grady") was hired as a central station operator trainee in early September 1993. She began her employment with Affiliated on September 20, 1993.... I was responsible for hiring Ms. Grady and for attempting to train her for the operator position.

9. From the outset of her employment, it was obvious that Grady was having great difficulty grasping the basic functions of the central station operator job. During the first several day [*sic*] in which she was asked to observe the experienced operators, it became apparent that Ms. Grady was simply was [*sic*] unable to understand the usage of a computer terminal or how to perform simple computerized tasks.

10. Moreover, when I would correct her misunderstandings about the operation of the computer terminal or suggest how she might improve her comprehension, she frequently responded defensively and told me that she "knew what she was doing" and that I was not being fair with her.

11. After four or five days of attempting to explain the operation of the computer terminal to Ms. Grady, she was asked to sit at the terminal and handle incoming calls. Each time Ms. Grady was asked to handle a call, she was unable to perform simple computer commands such as moving from screen to screen and cross-referencing subscriber accounts to locate customer information. She also consistently performed the wrong dispatch functions in response to incoming calls, and was unable to provide clear verbal instructions when required.

12. When Ms. Grady was unable to handle simple alarm calls after a full week of training, I determined that she was not working out and that it made little sense to continue to train her. Moreover, her defensiveness and failure to listen to constructive criticism made it difficult to help her improve. Accordingly, at the end of the shift, I told Ms. Grady that I was not happy with her performance.

13. After the shift, I spoke to Richard Bunkiewicz and told him that Ms. Grady was unable to grasp the duties of an operator. After a brief discussion, we agreed that it would be best to let Ms. Grady go.

(Affidavit of Stella Bacolas dated June 28, 1996 ("Bacolas Aff."), ¶¶ 7–13.) Affiliated also submitted the affidavit of Bunkiewicz, who confirmed Bacolas's description of the decision to terminate Grady and stated that he had informed Grady, when firing her, that the reason for the termination was the quality of her performance:

5. [On] September 29, 1993, I called Ms. Grady into my office at the beginning of her shift and said that I was very sorry to tell her that we had made a decision to "let her go". She asked me why she was being terminated, and I explained that she was not progressing as quickly as other employees at learning how to perform the functions of the central operator job, and that we needed people who were able, after a short period of time, to handle incoming calls on their own. Ms. Grady asked me if it was anything specifically that she had done to warrant her termination, and I told her that the decision was based on her performance....

[6]. At no time did I tell Ms. Grady that her termination was unrelated to her job performance or that it was based on a "gut feeling". Rather, I made it absolutely clear that she was being terminated because she was unable to grasp the functions of the central operator job within a sufficient period of time.

(Affidavit of Richard Bunkiewicz dated June 28, 1996, ¶¶ 5–6.) Affiliated also submitted a September 29, 1993 "payroll status change" record indicating Grady's discharge and describing the "reason for change" as "unsatisfactory performance."

Bacolas stated that Grady had not been fired because of her age or treated any differently from employees who were younger:

15. .... Denise Franco (DOB 3/1/68) and Milagros Montano (DOB 8/6/62) were hired on September 27, 1993. Like Grady, Ms. Franco was unable to grasp the operator functions and was terminated for unsatisfactory performance on October 8, 1993. Ms. Montano, who was a marginal trainee, resigned her job on October 18, 1993.

....

17. Ms. Grady's claim that her employment was terminated because of her age is, in a word, ludicrous. I am presently fifty-five years old. Neither I nor anyone else during my tenure with Affiliated has ever discriminated against any employee on the basis of age or for any other reason. In fact, Affiliated employs many older workers like myself who make up a substantial portion of our workforce.

18. While I never knew Grady's exact age during her brief employment, it was obvious when I decided to hire her that she was in her late forties or early fifties. She was only *seven days older* when I decided that her poor performance warranted termination. To suggest that in

seven days time I would become biased against older workers is absurd and insulting.

(Bacolas Aff. ¶¶ 15, 17–18 (emphasis in original).)

Affiliated also submitted excerpts from Grady's deposition, at which she testified that her factual basis for asserting that she was dismissed because of her age was that she was "an excellent employee," that she was "well ahead of the other trainees," doing more than was asked of her, and that she "did not get an answer as to why [she] was dismissed." (Deposition of Maxine Grady ("Grady Dep.") at 50.) Grady admitted that during her 1½ weeks at Affiliated, no one, to her recollection, ever made a comment that she viewed as relating to her age. (*Id.* at 55–56.) She also testified that she was unable to point to any individual who she believed harbored animosity toward older workers or favored younger workers. (*Id.* at 55.) When asked whether she believed Bunkiewicz had any animus against older workers, Grady stated, "I'm sure he didn't have anything personal, in that sense, but it could be a preference. I have no idea." (*Id.* at 62.) When asked whether Bacolas had treated her any differently from the way Bacolas treated younger workers, Grady responded, "Possibly at one particular point. It's possible" (*id.* at 63); but she could not recall any words or actions, saying that Bacolas "may not have verbalized anything. There is an attitude. There is a certain nuance. I was suspicious at the point when the other two young ladies came in, that's when I became suspicious" (*id.* at 64). Grady stated that Bacolas was "friendly with [her] in the beginning" but less so thereafter, as Bacolas "just seemed to not take into account that I was doing good, as far as taking calls when I was not expected to do that." (*Id.* at 65.)

Affiliated also presented evidence that in its 1996 workforce of 51 employees, 15 (or approximately 29 percent) were over the age of 40, and seven (or approximately 14 percent) were over the age of 50. It also presented a list of the persons—previously submitted to the EEOC in response to that agency's request for such information—whose employment Affiliated had terminated during the period January 1, 1993, through March 9, 1994. Of those 10 employees, nine—all except Grady—were under the age of 28.

In opposition to summary judgment, Grady submitted, *inter alia*, an affidavit she had filed with the EEOC, along with parts of her deposition and affidavits from Franco and Montano. Grady stated that she had sat and observed experienced operators as instructed, that she was the oldest person on her shift, that she believed she had been fired because she was older, and that neither Bacolas nor Bunkiewicz had ever criticized her work or told her a reason for her discharge:

> On September 28, 1993, Ms. Bacolas said to me that she was not pleased, and I responded, not pleased with what? To which she did not respond.

> On September 29, 1993 I was called in to the office by Richard Bunkiewicz and told, it was not working out. I asked what was the reason. He said it was not my work or anything like that. When I insisted that he give me a reason, all he came up with was that it was a gut feeling he had.

> I believe that I was discriminated against because of my age (52) [*sic*]. . . . Upon belief that had I been younger and in my 20's, I would still be employed.

(Grady Affidavit dated March 9, 1994, at 2.)

Grady disputed Bacolas's statement that Grady had been asked to handle calls as part of her official training, asserting that that training had consisted only of watching experienced operators and that Bacolas had not given her any training. In support of this position, Grady submitted affidavits from Franco and Montano, who stated that Grady did not receive training from Bacolas:

> *During the one and one-half (1–1/2) week tenure of Plaintiff Maxine Grady, and from the first time I met and observed Plaintiff Maxine Grady (when I was first introduced to her on Thursday, September 23, 1993) until her last day with Defendant Affiliated (Wednesday, September 29, 1993; when she was fired), I never witnessed Ms. Bacolas ever sit down with Plaintiff Maxine Grady at the computer*

terminal at any time (other than for a brief moment to adjust her head-set).

(Affidavit of Denise Franco dated July 26, 1996, sworn to August 3, 1996 ("Franco Aff."), ¶ 6, Affidavit of Milagros Montano dated July 22, 1996, sworn to August 1, 1996 ("First Montano Aff."), ¶ 7 (emphasis in originals).) Franco and Montano also stated in their respective affidavits that *"[d]uring the one and one-half (1–1/2) week[s]"* that Grady was at Affiliated, "at no time did Ms. Bacolas *ever* sit down with me to instruct me (or any one of the three other trainees) on the computer terminal. It just never happened" (Franco Aff. ¶ 13, First Montano Aff. ¶ 14 (emphasis in originals)); that *"I* [affiant's name] was *never* ordered by Ms. Bacolas, or anyone else, to switch places with an experienced operator. I wasn't! And, I didn't!" (Franco Aff. ¶ 14, First Montano Aff. ¶ 15 (emphasis in originals)); and that *"I* [affiant's name] was *never* assigned, by Ms. Bacolas, or anyone else, to my own computer terminal" (Franco Aff. ¶ 15, First Montano Aff. ¶ 16 (emphasis in originals)). Both Franco and Montano stated that after Grady was fired, they recalled hearing someone at Affiliated express disapproval of the way Grady dressed, and both concluded that "[t]here was no way" Bacolas or anyone "could have complained" "about [Grady's] so-called 'unsatisfactory work performance' (any more than ... about mine), because we *all* knew that none of the four trainees had (up to that time) done any real work." (Franco Aff. ¶ 16, First Montano Aff. ¶ 17 (emphasis in originals).)

Montano also provided a second affidavit, at the request of Affiliated, "to explain and correct" her first affidavit. (Affidavit of Milagros Montano dated September 19, 1996 ("Second Montano Aff."), ¶ 1.) In addition to stating that she had begun work at Affiliated not on September 23, but rather on "September 27, 1993, just two days prior to Grady's termination" (Second Montano Aff. ¶ 2), Montano stated that

> while I do not recall actually seeing Ms. Bacolas sitting with Ms. Grady at a particular computer terminal, I do recall that Ms. Bacolas did meet with a small group of operator trainees to explain the use of Affiliated's computer terminals and to question trainees about their understanding of the operator functions.
>
> 4. Finally, I did not know before speaking with Affiliated's attorney that Ms. Grady is claiming that she was fired because of her age. Nothing that I heard or observed during my employment with Affiliated in any way indicated to me that Ms. Grady (or anyone else) was treated differently because of her age or that Ms. Grady was fired because of her age.

(*Id.* ¶ 3–4.)

In a Memorandum and Order dated November 27, 1996 ("Opinion"), the district court granted the motion for summary judgment on the ground that, assuming Grady had made out a prima facie case of age discrimination, Affiliated had adequately supported its contention that Grady was fired for unsatisfactory performance, and Grady had not produced any evidence to show that that explanation was pretext. The court stated, *inter alia*, that "Bacolas told plaintiff she was not pleased with her work," Opinion at 3, and that Grady had

> worked for defendant for eight days. Defendant thus had more than one and one-half work weeks during which to review plaintiff's performance. Plaintiff concedes that, while training, she not only sat and listened, but took three or four calls under the supervision of an experienced operator. It is thus clear that defendant had an opportunity to review plaintiff's performance.

*Id.* at 8. The court stated that

> [w]hile plaintiff vigorously argues that she was never asked to sit at a terminal and thus her performance could not have been evaluated, she concedes that she did indeed take calls at a terminal on several occasions. Whether plaintiff considered these calls "official" or not is not relevant; they were an adequate basis for review of her abilities. I conclude that plaintiff has failed to show a genuine issue of material fact as to whether the reason proffered by defendant is false.

The hiring (and the subsequent departure) of younger employees, the statements by Bacolas, and plaintiff's

perception of discrimination—even taken together—are likewise insufficient. Drawing all inferences and resolving all ambiguities in favor of the plaintiff, I cannot conclude that there is a genuine issue of material fact for trial.

*Id.* at 11–12.

Grady moved for reconsideration, taking issue with several parts of the district court's opinion. She reiterated her assertion that Bacolas did not specify that it was Grady's performance with which she was "not pleased." She stated that the court's conclusion that Affiliated could have evaluated her performance on the basis of the several telephone calls she handled was flawed because Affiliated "never knew about the three or four calls I surreptitiously (and yes, 'unofficially') took (with the collusion of certain of the operators I sat next to and watched); and since Defendant never knew, it thus could not evaluate even these." (Plaintiff's Motion for Reconsideration ("Reconsideration Motion") at 14–15.) She also stated, "I did not *ever* train under Bacolas. Moreover, other than by sitting and observing, I also did not *train under* any experienced operators" (*id.* at 11 (emphasis in original)); and "I have always, from the beginning until now, unwaveringly and consistently not hesitated to testify, that I have 'performed' *ZERO— ZILCH—NADA* work to be evaluated by" (*id.* at 13 (emphasis in original)). She also argued that the district court had ignored the affidavits of Franco and Montano that "*they themselves,* like me (and Danielle Pionegro) were also never required (or permitted) to do *any* work either—other than sitting and watching that is." (*Id.* at 3 (emphasis in original).)

The court denied the motion for reconsideration from the bench on January 15, 1997, stating that Grady had called nothing new to its attention. This appeal followed.

## II. DISCUSSION

On appeal, Grady contends that there are genuine issues of fact to be tried as to the reason for her discharge and that summary judgment should not have been granted without affording her additional discovery. For the reasons that follow, we find no basis for reversal.

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1607, 26 L.Ed.2d 142 (1970). In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

■ In order to establish a prima facie case of discriminatory discharge in violation of the ADEA, a plaintiff must show that (1) at the time of discharge she was at least 40 years of age, (2) her job performance was satisfactory, (3) she was discharged, and (4) her discharge occurred under circumstances giving rise to an inference of discrimination on the basis of age. *See, e.g., Burger v. New York Institute of Technology,* 94 F.3d 830, 833 (2d Cir.1996); *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 83 (2d Cir.1990). Once the plaintiff has adduced evidence sufficient to establish a prima facie case, the defendant has the burden of producing "through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (internal quotation marks and emphasis omitted).

■ If the defendant meets its burden of producing an age-neutral reason for the discharge, the presumption of discrimination

raised by the prima facie case "drops out of the picture." *Id.* at 511, 113 S.Ct. at 2748; *see Fisher v. Vassar College,* 114 F.3d 1332, 1346–47 (2d Cir.) (en banc), *petition for cert. filed,* 66 U.S.L.W. 3178 (U.S. Sept. 2, 1997) (No. 97–404), and the plaintiff, in order to defeat summary judgment, must present evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by age discrimination, *see, e.g., Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997) (per curiam); *Viola v. Philips Medical Systems of North America,* 42 F.3d 712, 716 (2d Cir.1994); *Woroski v. Nashua Corp.,* 31 F.3d 105, 108–09 (2d Cir. 1994); *see also St. Mary's Honor Center v. Hicks,* 509 U.S. at 515, 113 S.Ct. at 2751 (a proffered "reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason" (emphasis in original)). Thus, when the district court considers whether the evidence can support a verdict of discrimination on a motion for summary judgment, it "must analyze the evidence, along with the inferences that may be reasonably drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination." *Fisher v. Vassar College,* 114 F.3d at 1347.

■ Although each case must involve an examination of all the circumstances, some factors strongly suggest that invidious discrimination was unlikely. For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring. *See, e.g., LeBlanc v. Great American Insurance Co.,* 6 F.3d 836, 847 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174–75 (8th Cir.1992); *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991) ("[I]n cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."). *See also Renz v. Grey Advertising, Inc.,* —— F.3d ——, ——, No. 96–7775, 1997 WL 433675, at *7 (2d Cir. Aug. 4, 1997) (erroneous jury instruction requiring finding that age was "the real reason" for termination did not prejudice age-discrimination plaintiff where, *inter alia,* the allegedly biased supervisor who terminated plaintiff's employment had selected her to work in his group less than two years earlier).

■ Within this framework, summary judgment dismissing the complaint in the present case was proper, although we note that in some instances the district court may not have viewed the evidence in the light most favorable to Grady. The court's statement that "Bacolas told [Grady] she was not pleased *with her work,*" Opinion at 3 (emphasis added), indicating that Bacolas had specified Grady's performance as the reason for her displeasure, apparently accepted Bacolas's version of the conversation, in preference to that of Grady. Though a factfinder would likely do the same, the assessment of credibility and the drawing of inferences adverse to the nonmoving party is not within the province of the court in deciding a motion for summary judgment. Grady also complains that the court improperly drew inferences against her in concluding that Affiliated could have evaluated her performance on the basis of her handling of calls that Grady says Affiliated "never knew about" (Reconsideration Motion at 14). The validity of that criticism is far from clear, however, given Grady's description of the factual bases for her claim of age discrimination, for by repeatedly suggesting that Affiliated had failed to give her credit for her extra work, she plainly indicated that it knew of the calls she fielded. For example, Grady inferred age discrimination from the fact that Bacolas was not more appreciative of the way Grady handled those calls (*see, e.g.,* Grady Dep. at 65 ("She just seemed to not take into account that I was doing good, as far as taking calls when I was not expected to do that.")). Given Grady's testimony, the court may well have concluded that her assertion that Affiliated did not know of her unauthorized fielding of calls did not create a dispute that was genuine.

In any event, we cannot conclude that the district court erred in granting summary judgment against Grady, because all of the factual disputes to which she points are, in light of the record, entirely immaterial. Grady's assertions that she was not trained, was never told she was performing poorly, and never fielded telephone calls except "surreptitiously" without Affiliated's knowledge, may serve to create a factual dispute as to whether Affiliated's actual reason for discharging Grady was her poor performance in fielding calls. However, the creation of a genuine issue of fact with respect to pretext alone is not sufficient. There must also be evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination on the basis of age.

The record in the present case is bereft of evidence from which a factfinder could infer that Affiliated discriminated against Grady on the basis of her age. For example, Montano stated that she had not heard or observed anything to indicate in any way that Grady or anyone else at Affiliated was treated differently because of age or that Grady was fired because of her age. Grady herself was unable to point to any statement by anyone at Affiliated that she believed related to her age. She was also unable to point to any person at Affiliated whom she viewed as having an animus against older workers. Her suggestion that Bunkiewicz "could" have had a preference was purely speculative, as illustrated by her very next sentence, which was, "I have no idea" (Grady Dep. at 62). She could not recall any action or statement by Bacolas that showed age discrimination; she could only say that Bacolas smiled at her less approvingly as Grady's tenure—and her "surreptitious" fielding of calls when she was supposed to be only observing—wore on. The circumstantial evidence strongly indicated that Bacolas's waning smile was not an indication of discrimination against older workers. Bacolas, who caused Grady to be fired, was the very person who had hired her just eight days earlier. Bacolas was also a year older than Grady. Further, during the 14–15 month period surrounding Grady's employment, Affiliated terminated the employment of 10 persons, and all of them except Grady were under the age of 28.

The record is perhaps most remarkable for the presence of affirmative evidence—presented by Grady herself—that older and younger trainees were in fact treated the same. The virtually identical affidavits that Grady presented from Franco and Montano, quoted in Part I.B. above, showed that all of the trainees, regardless of age, received the same training. Grady herself emphasized that "*they themselves,* like me (and Danielle Pionegro) were also never required (or permitted) to do *any* work either—other than sitting and watching that is." (Reconsideration Motion at 3 (emphasis in original).) And, following their identical training experiences, both Grady, age 51, and Franco, age 25, had their employment terminated by Affiliated less than two weeks after they had begun work.

In light of the record, we see no possibility that any rational factfinder could infer that Grady was treated differently from younger trainees or was fired because of her age. Summary judgment dismissing the complaint was proper.

We also reject Grady's contention that summary judgment should not have been granted without allowing her to conduct additional discovery. The management of discovery lies within the sound discretion of the district court, and the court's rulings on discovery will not be overturned on appeal absent an abuse of discretion. *See Hollander v. American Cyanamid Co.,* 895 F.2d at 84. We see no abuse of discretion here. Affiliated provided Grady with, *inter alia,* the names and addresses of her fellow trainees to the extent that it had that information. The court's refusal to compel production of such information as the home telephone numbers of present or former employees was well was within its discretion. Affiliated stated that it did not have records identifying which operators Grady observed during her training period, and Grady made no showing that that statement should not be credited. In any event, the identities of those operators would seem to have minimal relevance since, given the lack of any evidence of age discrimination and the evidence that all trainees had

been treated the same by Affiliated's management, the issue of whether Grady actually traded places with experienced operators or fielded calls in a way they thought competent is not material.

## CONCLUSION

We have considered all of Grady's arguments on this appeal and have found them to be without merit. The judgment of the district court dismissing the complaint is affirmed.